# IN THE UNITED STATES DISTRICT COURT
# DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| United States of America, | C/A No. 3:24-cr-735-JFA |
| v. | |
| Willie Marion Duggan, | **MEMORANDUM OPINION AND ORDER** |
| Defendant. | |

## I.    INTRODUCTION

This matter is before the court on Willie Duggan's (Defendant) Motion to Suppress. (ECF No. 51). Specifically, Defendant moves to suppress a firearm seized during a traffic stop. The Government filed a Response, arguing the officers acted with probable cause and reasonable suspicion. (ECF No. 72). In addition to thorough briefing, the parties presented evidence and oral argument before the court. Accordingly, this matter is ripe for review. For the reasons stated below, the motion to suppress is denied.

## II.    FACTS[1]

Given that the entirety of the traffic stop underlying this motion was captured via dash camera and body-worn camera, a vast majority of the relevant facts are not in dispute.

On February 23, 2024, Richland County Sheriff's Department Deputy Sterling Morrow conducted a traffic stop of a black sedan for an improper turn and a license plate

---

[1] These facts are based upon video footage from dash cameras, body-worn cameras, and testimony from the responding officer.

infraction. Deputy Morrow approached the passenger side of the vehicle and spoke to the driver who was identified as Boyce Tisdale. Tisdale provided Deputy Morrow with a South Carolina driver's license. Duggan, who was seated in the front passenger seat of the vehicle, stated he did not have identification and provided Deputy Morrow the false name of "Reggie Smith."[2]

Upon returning to his patrol car with Tisdale's driver's license, Deputy Morrow asked another deputy to stand by the window of Tisdale's vehicle because he believed the occupants were "acting weird." When asked to expound on this at the hearing, Morrow explained that Duggan faltered when giving his date of birth which Morrow found suspicious. Deputy Morrow entered Tisdale's information in a law enforcement database and then reapproached the driver's side of Tisdale's vehicle. He asked Tisdale what he was on probation for, and Tisdale responded that he "used to sell drugs." Deputy Morrow then asked Tisdale for permission to search the vehicle, but Tisdale refused to provide consent for the search.

At this time, approximately 6 minutes after initiating the stop, Deputy Morrow requested Tisdale's proof of insurance, and Tisdale provided Deputy Morrow with an expired insurance card. For the next several minutes, Tisdale searched his cell phone, wallet, and car for a current proof of insurance. He also called his mother who indicated that she would look for current insurance documentation. Approximately eleven minutes

---

[2] Although Duggan provided a false name, Morrow was unaware that this identity was false for the duration of the relevant events.

after executing the stop, Deputy Morrow told Tisdale that a picture of a current insurance card would suffice and stated, "you work on that." During the hearing, Morrow explained that he could have issued Tisdale a ticket, and further had the vehicle towed, for failing to provide proof of insurance at that time. However, he allowed Tisdale to search for proof of insurance as a courtesy to Tisdale to allow him to present proof sufficient to prevent the need for a ticket and tow. Tisdale continued his search for current proof of insurance as Morrow returned to his patrol car.

Once back in his patrol car, Morrow stated to a civilian passenger[3]: "He don't want me going in that car… sometimes we got to find a way to get inside the vehicle." The civilian in the car suggested calling a canine. Less than a minute later, Morrow says "I got a feeling he's got dope in there and I don't have PC at the moment to get in."

Morrow then requested a canine deputy to respond to conduct a "free air sniff." He then ran Tisdale's information through the South Carolina Department of Motor Vehicles' (SCDMV) database to see if the vehicle was insured at the time it was registered. As he reviewed Tisdale's information, Deputy Morrow stated he was going to see if Tisdale could provide proof of insurance for the vehicle. Approximately 18 minutes after the stop began and before the canine officer arrived, Deputy Morrow returned to Tisdale's vehicle and asked Tisdale if he had "any luck" locating his insurance information. Tisdale was unable to provide Deputy Morrow with proof of his insurance. Deputy Morrow then informed

---

[3] A civilian passenger was on a "ride-along" with Deputy Morrow and remained in the police car for the duration of the stop.

Tisdale that he could smell alcohol and asked Tisdale about the last time Tisdale consumed alcohol. Tisdale stated that he drank two beers earlier in the day.

At the hearing, Deputy Morrow explained that, prior to returning to the car for the third time, he lacked probable cause to search the vehicle despite his suspicions. However, upon returning to the car he smelled alcohol for the first time during the stop. Defendant avers that Morrow's smelling of alcohol was simply a farce or ruse constructed to present Morrow with sufficient probable cause to search the vehicle. Despite these contentions, Tisdale himself confirmed that he had been drinking earlier in the day. Accordingly, the court finds Morrow's testimony that he smelled alcohol on his return to the vehicle to be credible.

Deputy Morrow then instructed Tisdale to exit the vehicle. Morrow testified that, after smelling alcohol and confirming Tisdale had been drinking, he intended to search the vehicle for open container or determine if Tisdale was driving while impaired. Tisdale hesitated to exit the vehicle but eventually complied. When Deputy Morrow placed one of Tisdale's hands behind Tisdale's back, Deputy Morrow saw Duggan move from the passenger seat to the driver's seat. As Duggan attempted to drive away, Deputy Morrow saw a black firearm fall from Duggan's lap.

Deputy Morrow was able to turn the vehicle off before Duggan could drive away, and Duggan then fled on foot before being apprehended.

Duggan was later charged with being a felon in possession of a firearm based on the above conduct. Duggan now moves to suppress the firearm, claiming that an impermissible prolongation of the stop renders the seizure of the firearm unconstitutional.

### III. LEGAL STANDARD

The Fourth Amendment forbids unreasonable searches and seizures. U.S. Const. amend. IV. "[S]earches and seizures conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well delineated exceptions." *Minnesota v. Dickerson*, 508 U.S. 366, 372 (1993) (internal quotation marks omitted). The government bears the burden to justify a warrantless search or seizure. *United States v. Curry*, 965 F.3d 313, 319 (4th Cir. 2020) (en banc). "When police violate the Fourth Amendment's prohibition on unreasonable searches and seizures, the government may be forbidden from using the improperly obtained evidence at trial." *United States v. Villa*, 70 F.4th 704, 716 (4th Cir. 2023).

"A traffic stop is a 'seizure' within the meaning of the Fourth Amendment and must be reasonable under the circumstances." *United States v. Palmer*, 820 F.3d 640, 648 (4th Cir. 2016). "[A] passenger is considered 'seized' for Fourth Amendment purposes when a police officer makes a traffic stop." *United States v. Soriano-Jarquin*, 492 F.3d 495, 500 (4th Cir. 2007) (citing *Brendlin v. California*, 551 U.S. 249 (2007)). "If a passenger is considered 'seized' for Fourth Amendment purposes when a police officer makes a traffic

5

stop, that passenger may then challenge the constitutionality of the actions taken during that stop." *Id.*

> The standard governing traffic stops under the Fourth Amendment is well-established in this Circuit. Traffic stops are subject to the reasonableness requirement of the Fourth Amendment. The standard the Supreme Court articulated in *Terry v. Ohio*, 392 U.S. 1 (1968), applies to traffic stops because they are investigatory stops rather than custodial arrests. Accordingly, [a court must] ask (1) if the stop was legitimate at its inception, and (2) if the officer's actions during the seizure were reasonably related in scope to the basis for the traffic stop. For the initial stop to be reasonable, the officer must have probable cause to believe a traffic violation occurred.

*United States v. Miller*, 54 F.4th 219, 228 (4th Cir. 2022) (cleaned up).

A lawful traffic stop "can become unlawful if it is prolonged beyond the time reasonably required to complete [the] mission" of issuing a warning ticket. *Illinois v. Caballes*, 543 U.S. 405, 407 (2005). The permissible duration of a traffic stop "is determined by the seizure's mission—to address the traffic violation that warranted the stop," meaning that it may "last no longer than is necessary to effectuate that purpose." *Rodriguez v. United States*, 575 U.S. 348, 354 (2015) (cleaned up). "Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.* "An officer may engage in certain safety measures during a traffic stop, but generally must focus his attention on the initial basis for the stop. *United States v. Hill*, 852 F.3d 377, 382 (4th Cir. 2017). "An officer may engage in ordinary inquiries incident to the traffic stop, such as inspecting a driver's identification and license to operate

a vehicle, verifying the registration of a vehicle and existing insurance coverage, and determining whether the driver is subject to outstanding warrants." *Id.*[4]

Officers also may engage in other investigative techniques unrelated to the underlying traffic infraction or the safety of the officers while diligently pursuing the purpose of a traffic stop. *United States v. Hill*, 852 F.3d 377, 382 (4th Cir. 2017). However, this unrelated activity is permitted under the Fourth Amendment only as long as it does not prolong the roadside detention for the traffic infraction. *Id.* For example, an officer may question the occupants of a car on unrelated topics without impermissibly expanding the scope of a traffic stop. *Id.* An officer also may engage a K-9 unit to conduct a "dog sniff" around a vehicle during a lawful traffic stop in an attempt to identify potential narcotics. "However, because such a sniff or investigative questioning is intended to detect ordinary criminal wrongdoing, these actions may not prolong the duration of the traffic stop absent consent of those detained or reasonable suspicion of criminal activity." *Id.* (internal citation and quotation omitted).

"[T]o extend the detention of a motorist beyond the time necessary to accomplish a traffic stop's purpose, the authorities must either possess reasonable suspicion or receive the driver's consent." *United States v. Williams*, 808 F.3d 238, 245–46 (4th Cir. 2015).

---

[4] The Supreme Court has opined that "[t]hese checks serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly." *Rodriguez v. United States*, 575 U.S. 348, 355 (2015).

7

The government bears the burden to justify a warrantless search or seizure. *United States v. Curry*, 965 F.3d 313, 319 (4th Cir. 2020) (en banc).

## IV.   ANALYSIS

Duggan does not challenge the legitimacy of the traffic stop at its inception. Instead, Duggan avers that the traffic stop was impermissibly extended. Duggan argues that officers had no legitimate reason to prolong the traffic stop. The Government counters that the bulk of the delay was caused by the driver's continued efforts to locate proof of insurance. As stated by the Supreme Court, an "officer may engage in ordinary inquiries incident to the traffic stop, such as inspecting a driver's identification and license to operate a vehicle, verifying the registration of a vehicle and existing insurance coverage, and determining whether the driver is subject to outstanding warrants." *United States v. Hill*, 852 F.3d 377, 382 (4th Cir. 2017). Approximately six minutes into the traffic stop, the video footage shows Morrow request proof of insurance and Tisdale then undertook a continued and concerted effort to obtain proof of insurance. Morrow returned to his vehicle while waiting for Tisdale to locate the requisite documentation. Several minutes later, when Morrow returned to the vehicle to verify Tisdale's insurance, Tisdale was still unable to provide the necessary documentation. Defendant avers that Morrow's continued efforts to obtain proof of insurance were a mere pretext undertaken to delay the stop so a canine officer could

8

arrive for further investigation. However, this contention is belied by Morrow's testimony and the fact that Morrow returned to the vehicle prior to the arrival of a canine officer.[5]

Thus, Duggan's argument that Deputy Morrow unlawfully extended the stop based on his belief that there were drugs in the car is not supported by the record. The mission of the traffic stop was not complete until Deputy Morrow confirmed Tisdale's valid proof of insurance. Tisdale continually searched for proof of insurance to avoid a ticket and Morrow acquiesced. This is not a case wherein law enforcement "slow-rolled" the process by performing unnecessary tasks or delaying the issuance of a ticket. This was a delay caused by a courtesy extended to a driver to avoid a citation. Accordingly, Morrow's actions cannot be deemed unreasonable.

Defendant expended much effort, argument, and ink describing South Carolina's vehicular insurance laws, the identification needed, their interplay with the SCDMV database, possible court proceedings, and so-on. Defendant continually cites the constellation of law and resources surrounding the required insurance in an effort to paint Morrow's request for proof of insurance as unreasonable. However, Defendant ultimately concedes that South Carolina law "requires that a driver maintain proof of insurance in the vehicle." (ECF No. 79, p. 9). Defendant's ultimate point is that Morrow should have

---

[5] At the hearing, Defense counsel averred that Morrow was specifically tracking the location of the canine officer enroute to his location so as to delay his reapproach to Tisdale to coincide with the canine officer. Other than Defendant's speculation on this point, there is no evidence to support the assertion Morrow was actively tracking and waiting for the canine officer. Moreover, Morrow returned to Tisdale's vehicle and discussed the presence of alcohol prior to the arrival of the canine officer.

immediately written Tisdale a ticket or warning for failing to provide proof of insurance and ceased further interaction. As Defendant opines, "there is no courtesy exception to the Fourth Amendment; kindness does not obviate constitutional safeguards."[6] (ECF No. 79, p. 2). However, the court is mindful that the touchstone of any Fourth Amendment inquiry is reasonableness. *Whren v. United States*, 517 U.S. 806, 817 (1996)("It is of course true that in principle every Fourth Amendment case, since it turns upon a 'reasonableness' determination, involves a balancing of all relevant factors."). With that in mind, the court cannot say that Morrow's request for insurance, followed by a brief pause while Tisdale diligently searched for the requisite proof, was unreasonable.

To Defendant's credit, an officer may not manufacture delays unrelated to the stop to engage in tangential investigations or stall in the hopes of stumbling across probable cause. Conversely, officers are not ordered to hastily run through a checklist of permissible inquires related to the stop and issue citations at breakneck speed. There is no bright line

---

[6] In one breath, Defendant argues that subjective intent, such as Morrow's courtesy of waiting for Tisdale to locate proof of insurance to avoid a citation, is irrelevant, while also chastising Morrow for his subjective belief that Tisdale and Defendant had drugs in the car. *Compare* (ECF No. 79, p. 2)("An officer's subjective intent—whether courteous or not—does not alter our constitutional protections. The test is objective reasonableness, not benevolence.") *with* (ECF No. 51, p. 6) ("This 'fishing expedition' was because the officer—based on his own words—believed drugs were in the car."). Defendant cannot wield Morrow's subjective thoughts as both a sword and a shield. The law on this point is clear: Courts, when considering a Fourth Amendment challenge, are constrained to focus on objective reasonableness to the exclusion of any subjective intent. *Whren v. United States*, 517 U.S. 806, 813 (1996)("[T]hese cases foreclose any argument that the constitutional reasonableness of traffic stops depends on the actual motivations of the individual officers involved…. Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis.").

between the reasonable and unreasonable. Instead, the court is left to review the totality of the circumstances when determining whether a stop has been unreasonably extended. Most relevant here, the Fourth Circuit has instructed that an "officer may engage in certain safety measures during a traffic stop, but generally must focus his attention on the initial basis for the stop." *United States v. Hill*, 852 F.3d 377, 382 (4th Cir. 2017). "An officer may engage in ordinary inquiries incident to the traffic stop, such as inspecting a driver's identification and license to operate a vehicle, verifying the registration of a vehicle and existing insurance coverage, and determining whether the driver is subject to outstanding warrants." *Id.* Thus, Morrow was explicitly entitled to request proof of insurance as required by South Carolina law. Allowing a driver to willingly search for the requisite proof to avoid citation and a tow does not appear unreasonable when examining the totality of the circumstances. Thus, the delay caused by Tisdale's extended search for proof of insurance did not render the stop unconstitutional. This does not end the inquiry, however.

Defendant additionally argues that Morrow lacked reasonable suspicion sufficient to remove Tisdale from the vehicle. When Tisdale indicated that he did not have valid proof of insurance, Deputy Morrow contemporaneously advised Tisdale that he detected the odor of alcohol coming from the vehicle. Tisdale then confirmed that he consumed two beers prior to operating his vehicle. Defendant avers that alcohol itself is not contraband, and the mere odor alone does not directly indicate an open container is present. Defendant contends that smelling alcohol on a driver or in the car, without more, does not establish probable cause for an open container search. As Defendant would have it, an adult driver may smell

11

of alcohol from lawful drinking, however, without an observed container or other corroborating facts, an officer lacks concrete evidence of a violation.

However, the Government avers that Deputy Morrow did not act on the smell of alcohol alone. Instead, Morrow's detection of the smell of alcohol, his observation that the occupants were "acting weird," coupled with Tisdale's admission to consuming beer prior to operating his vehicle provided reasonable suspicion to extend the stop for Deputy Morrow to investigate whether Tisdale had an open container or was driving while impaired in violation of South Carolina law.

When considering the totality of the circumstance, this combination of factors provided Morrow with enough reasonable suspicion to remove Tisdale from the vehicle for further investigation. Immediately upon removing Tisdale, Morrow viewed a firearm in plain sight[7] while Duggan attempted to flee the scene.

In summation, Deputy Morrow did not unlawfully extend the traffic stop of the vehicle in which Duggan was a passenger. Deputy Morrow diligently pursued the mission of the stop, which included confirming that the driver had valid insurance documentation. After developing reasonable suspicion of an alcohol-related violation, Deputy Morrow asked the driver to exit the vehicle and observed a firearm fall from Duggan's lap as he attempted to leap into the driver's seat and flee. The traffic stop and actions taken by Deputy Morrow during the stop were reasonable, and Duggan's motion must be denied.

---

[7] *See Horton v. California*, 496 U.S. 128 (1990) ("The plain view doctrine is often considered an exception to the general rule that warrantless searches are presumptively unreasonable.").

The Government also asserts an inevitable discovery argument because Deputy Morrow could have impounded Tisdale's vehicle due to the failure to provide proof of valid insurance. Had the vehicle been impounded, it would have been subject to an inventory search pursuant to Richland County Sheriff's Department policy. Consequently, the Government avers the firearm would have been found during the inevitable inventory search. However, given the above analysis, the court need not rule on this alternative argument.

## V.  CONCLUSION

For the reasons stated above, Defendant's motion to suppress (ECF No. 51) is denied.

IT IS SO ORDERED.

October 20, 2025  
Columbia, South Carolina

Joseph F. Anderson, Jr.  
United States District Judge